**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GARNER PROPERTIES & MANAGEMENT, on Behalf of Itself and All Others Similarly Situated, | Civil Action No.: |
| Plaintiff, | |
| v. | |
| FAIR ISAAC CORPORATION, | |
| Defendant. | CLASS ACTION COMPLAINT JURY TRIAL DEMANDED |

1

Plaintiff Garner Properties & Management ("Plaintiff"), brings this action against Defendant Fair Isaac Corporation ("Fair Isaac") individually and on behalf of all end-user business customers that indirectly purchased a FICO Score in the Business Market for credit scores for use and not for resale. Fair Isaac has engaged in anticompetitive behavior which forced Plaintiff and members of the Classes to pay artificially inflated prices for credit scoring services and generated millions of dollars in supra-competitive annual revenues for Fair Isaac. Fair Isaac has maintained a monopoly share in excess of 90% of the market for credit scores by suppressing competition and inhibiting innovation. Therefore, Plaintiff and the Classes seek damages, injunctive relief and other relief pursuant to federal antitrust laws, state antitrust, unfair competition, and consumer protection laws, and the laws of unjust enrichment, and demand a trial by jury.

## I. INTRODUCTION

1. According to Fair Isaac, its FICO Scores are used for over 90% of all lending decisions in the United States. Fair Isaac's FICO credit scores have dominated the market for nearly three decades and have "maintained a 90-plus percent market share for at least 13 years."

2. Credit reporting agencies ("CRAs") collect and maintain information for credit reports. The three major CRAs in the United Stated are Equifax, Experian, and TransUnion. Credit reports list bill payment history, loans, current debt, and other financial information. They show where consumers work and live and whether they have been sued, arrested, or filed for bankruptcy.

3. Credit reports help lenders decide if they will give consumers credit or approve a loan. The reports also help determine what interest rates consumers are charged. Employers, insurers, and rental property owners also use credit reports.

4. CRAs are direct purchasers of Fair Isaac's FICO Scores. They directly purchase the FICO Scores as part of the credit reporting services they provide to millions of lenders, financial institutions, landlords, employers, and other businesses that use credit reports to determine credit history and/or default risk. Many CRAs also provide to their consumers FICO Scores that the CRAs have purchased from Fair Isaac.

5. CRAs have entered into agreements with Fair Isaac to distribute Fair Isaac's dominant FICO Scores. These distribution agreements contain anticompetitive restrictions, imposed by Fair Isaac, that eliminate CRAs' ability to develop their own competing credit scores and to distribute other competing credit score offerings. Fair Isaac has also imposed terms dictating that any lower price for FICO Scores that any one CRA negotiates is automatically available to all other CRAs. This restriction dramatically reduces the value to any one CRA of obtaining lower FICO Score prices and disincentivizes each CRA from negotiating lower royalty prices, because if a CRA obtained a lower royalty price, it would not gain a competitive advantage over other CRAs as a result. Additionally, Fair Isaac has crippled any attempt to introduce competition into the market for credit scores by charging discriminatory royalty prices for FICO Scores if a CRA bundles a competing credit score with a FICO Score.

6. Plaintiff Garner Properties & Management, Inc. is a real estate brokerage and property management company that indirectly purchases Fair Isaac's FICO scores through contracts with a third-party credit reporting company which, in turn, purchases credit screening services from one of the three major CRAs. The CRAs and third-party credit reporting companies sell FICO Scores to Garner Properties & Management pursuant to agreements between Fair Isaac and each CRA, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to Garner Properties & Management. The CRAs and third-party credit

reporting companies pass on to Garner Properties & Management and other business customers the royalty cost of each FICO Score.

7.     In 2006, VantageScore Solutions, LLC ("VantageScore Solutions") launched VantageScore—a credit score to compete against Fair Isaac's FICO Scores. VantageScore Solutions is an independent joint venture of the three major CRAs, Equifax, Experian, and TransUnion. Similar to Fair Isaac's FICO Score, VantageScore Solutions uses scoring codes and algorithms to convert a consumer's information in a consumer credit report into a credit score. Thus, VantageScore presented a competitively priced alternative to FICO Scores.

8.     In addition, a VantageScore has relevant and important advantages over a FICO Score. For example, a VantageScore considers a consumers' rental and utility payments, which enables it to provide a credit score for consumers with less than six months of credit history. Fair Isaac's FICO Score cannot do this. A VantageScore therefore provides a credit score for tens of millions more Americans than Fair Isaac's algorithms allow. If Plaintiff and similarly situated businesses were able to purchase VantageScores on economically-sensible terms, they would be able to see credit scores of tens of millions more consumers, enabling them to contract with millions more customers, tenants, and employees than they can using FICO Scores alone.

9.     However, since 2006, Fair Isaac has engaged in a pattern of anticompetitive conduct designed to discourage use of alternatives to FICO Scores, including VantageScores. Fair Isaac accomplished this goal by abusing its monopoly power to impose contractual terms on CRAs that prevent the CRAs from marketing and selling VantageScores or any other alternative to FICO Scores.

10.     As part of its goal of eliminating competition, Fair Isaac also waged a disparaging public relations and advertising campaign to create uncertainty about the reliability of VantageScores. The purpose of FICO's anticompetitive scheme is to prevent competition with

4

VantageScore and other scoring systems and to preserve Fair Isaac's monopoly.

11.    Fair Isaac's scheme worked. Through the anticompetitive conducted alleged herein, Fair Isaac succeeded in preventing VantageScore Solutions from gaining market share and thwarted the entry of other entities into the market for credit scores. Having successfully suppressed all other competition, Fair Isaac increased prices for its FICO products. But for Fair Isaac's anticompetitive conduct, VantageScore and other competitors of Fair Isaac would have gained market share, allowing for price competition and reducing the prices Plaintiff and similarly situated businesses paid for FICO products.

12.    Plaintiff and other indirect purchasers of Fair Isaac's FICO Score paid supracompetitive prices and have therefore suffered harm as a result of Fair Isaac's anticompetitive conduct. Fair Isaac's anticompetitive conduct harmed competition in the Business Market for credit scores. Opening this market to competition will spur innovation so that credit scores are fairly priced, more accurate, and score the tens of millions of creditworthy Americans denied access to credit under Fair Isaac's model.

13.    Plaintiff and other similarly situated business customers of FICO Scores are indirect purchasers of Fair Isaac's FICO Scores. They do not purchase FICO Scores directly from Fair Isaac itself, but instead purchase them from CRAs, who purchase them directly from FICO scores directly from Fair Isaac. For example, TransUnion is a direct purchaser of FICO scores, as it has pled in litigation against Fair Isaac in the Northern District of Illinois (*Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv- 08318).

## II.    PARTIES

14.    Plaintiff Gardner Properties & Management is real estate brokerage and property management company located in Taylor, Michigan.  During the Class Period, plaintiff indirectly

purchased Fair Isaac's FICO Scores through through contracts with third-party credit reporting companies which, in turn, purchase credit reporting services from one of the three major CRAs. The CRAs and third-party credit reporting companies sell FICO Scores to Garner Properties & Management pursuant to agreements between Fair Isaac and each CRA, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to Garner Properties & Management. The CRAs and third-party credit reporting companies pass on to Garner Properties & Management and other business customers the royalty cost of each FICO Score.

15.     Plaintiff was injured in its business or property as a direct, proximate, and material result of Defendant's violation of law.

16.     Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California, 95110.

17.     Plaintiff brings this state law class action on behalf of the Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injuries caused by Defendant's conduct in restricting the development and sale of credit scores and causing the prices of its own FICO Scores to be artificially inflated. Plaintiff also seeks injunctive relief under Sections 1 and 2 of the Sherman Act.

**III.     JURISDICTION AND VENUE**

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court possesses supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

19.     Defendant Fair Isaac is subject to the personal jurisdiction of this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because, among other reasons, it regularly

transacts busines within the State of Illinois.

20.     Venue is proper in this District pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c). Fair Isaac regularly transacts business within this District and a substantial portion of the affected interstate trade and commerce described in this Complaint were carried out in this District.

21.     Fair Isaac markets its products across state lines and receives substantial payments across state lines. Fair Isaac's business activities that are the subject of this Complaint are within the law of, and have substantially affected, interstate trade and commerce.

## IV.     FACTUAL ALLEGATIONS

### A.     Credit Scores and Credit Reports

22.     A credit score is a numerical expression of a person's credit history and is designed to measure the creditworthiness of an individual. It helps creditors determine whether to give credit, decide the terms they offer and what interest rates consumers pay. Higher scores generally indicate that an individual or business poses less credit risk and are more likely to make payments under a contract and manage money responsibly. Thus, having a high credit score can make it easier to get a loan, credit card, lower interest rates, rent an apartment, or provide access to lower insurance rates.

23.     Credit scores typically are produced by applying scoring algorithms to a person's consumer credit history.  A credit score is based on, for example, payment history, outstanding balances, length of credit history, applications for new credit accounts, and types of credit accounts (*e.g.*, mortgages, car loans, credit cards).

24.     Credit scores usually are accompanied by "reason statements," which inform the purchaser about the factors that most significantly affected that individual's credit score. A

7

number or alphanumeric code—called a "reason code"—is associated with each reason statement. Examples of reason statements include: "Account payment history is too new to rate"; "Amount owed on accounts is too high"; and "Too many recently active accounts."

25. The information in a credit report is often used to calculate a credit score. Credit reports list a consumer's bill payment history, loans, current debt, and other financial information. They show where the individual works and lives and whether they have been sued, arrested, or filed for bankruptcy. CRAs essentially collect consumer credit data and present the aggregated information in the form of a credit report.

26. CRAs continually gather credit and financial data about individuals from creditors, government entities, public records, collection agencies, and other third parties, and compile this information into a credit file. The CRAs then use an individual's credit file to populate a credit report on that individual for sale to businesses and consumers. Although there are numerous credit reporting agencies in the United States, the market is dominated by three major entities: Equifax, Experian, and TransUnion.

27. Credit reports help lenders decide if they will give credit or approve a loan. The reports also help determine what interest rate to charge. Employers, insurers, and rental property owners also look at credit reports.

28. Credit scores are the most widely-used indicators of consumers' creditworthiness in the United States and Fair Isaac's FICO Score is, by far, the most widely-used credit score. According to Fair Isaac, "FICO Scores are used in over 90% of U.S. lending decisions." They are crucial to millions of businesses that rely on indicators of creditworthiness to assess risk and make business decisions.

29. Credit scores and credit reports are separate and distinct products that can be sold

8

together or independently.

**B.    The Markets for Credit Scores**

30.    There are two distinct markets for credit scores—the "Business Market" and the "Consumer Market."

31.    The "Business Market" for credit scores consists of lenders, such as banks and credit card companies, financial institutions, and other businesses that assess risk and make business decisions or resell or otherwise provide the score to their own downstream customers. The "Consumer Market" for credit scores consists of credit scores sold directly to consumers to monitor their own credit records.

32.    In the Business Market, businesses purchase the credit scores of individuals and businesses to help them understand credit risk, make better-informed lending decisions, assess creditworthiness, and make business decisions. The Business Market also includes the FICO Scores that Plaintiff and other businesses indirectly purchase from Fair Isaac to provide to their customers.

33.    In the Consumer Market, Fair Isaac and other credit score producers, as well as CRAs, sell directly to consumers their own credit scores.  A consumer often purchases their own credit score for personal use, including to see how lenders view their creditworthiness, to understand the types and terms of financing they may be able to secure, to monitor their financial health, manage their debt, protect their identity and to determine if they are potentially eligible to make certain purchases.

34.    The Business Market for credit scores is a distinct product market for antitrust purposes. The businesses that use credit scores to assess creditworthiness, manage risk, and make business decisions do not consider credit reports, insurance scores, or any part of an

9

individual's consumer and credit history to be a substitute for credit scores. Likewise, the businesses that resell or otherwise provide credit scores to their own downstream customers do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores.

35.    The relevant geographic market in which Business credit scores are provided is the United States. The restraints on competition contained in Fair Isaac's contracts relate to business and consumer credit scores in the United States.

36.    Business customers, such as banks, credit card companies, financial institutions, real estate companies, insurance companies and other businesses, in the Business Market are a separate and distinct group of purchasers of credit scores. Business customers who purchase credit scores in the Business Market do not use credit scores in the same manner as consumer customers who purchase credit scores in the Consumer Market.

37.    Business customers in the Business Market purchase credit scores to make informed decisions, sell, advertise, or complement another product.   On the other hand, consumer customers in the Consumer Market purchase the credit scores as an end-product.

38.    Business customers in the Business Market also purchase credits scores in ways that consumer customers do not. For example, business customers may purchase credit scores individually or in batches of multiple people. Business customers in the Business Market who engage in pre-screening, such as credit card companies, often purchase credit scores in batches as part of their marketing efforts. They use credit scores as a method of selecting consumers in a particular credit score range that they wish to extend credit card offers under particular terms. However, consumer customers in the Consumer Market only purchase their own score.

39.    The vast majority of the credit reporting and credit scoring industry, industry

10

analysts, policy analysts, and investors recognize the Business Market as a separate market from the Consumer Market. Fair Isaac itself recognizes its Business and Consumer offerings as distinct product and revenue lines. Fair Isaac has divided its "Scores" profits and revenues into separate "business-to-business" or "B2B" and "business-to-consumer" or "B2C" segments in its Securities and Exchange Commission filings and shareholder calls over the last several years. In its 10-K and 10-Q filings for the past several years, Fair Isaac has distinguished between its "business-to-business scoring solutions and services" and its "business-to-consumer scoring solutions and services including myFICO solutions for consumers."

40.     Purchases in the Business Market for credit scores and Consumer Market for credit scores are also different. While business customers purchase credit scores from Fair Isaac through CRAs and/or third-party intermediaries, credit scores in the Consumer Market are often sold to consumers directly, such as when consumers purchase their credit score from Fair Isaac at myFICO.com.

### C.     Fair Isaac's FICO Score Has a Monopoly in the Business Market for Credit Scores

41.     Since as early as 1989, Fair Isaac has maintained a monopoly over the Business Market for credit scores, primarily due to the dominance of its FICO product line, which includes many different types of FICO Scores.

42.     Fair Isaac's "FICO Classic" credit scores are the best known and most widely used Business Market credit scores. Fair Isaac applies an algorithm to each credit reporting agency's data to generate a FICO Classic Score between 300 and 850 that purports to give an indication of the individual's credit risk. It also generates a set of "reason statements," with corresponding codes, that explain the reasons the consumer has not been assigned the maximum score.

11

43.     FICO Scores are the credit scores most widely used by lenders and are used in over 90% of U.S. credit lending decisions.  Every year, lenders access billions of FICO Scores to help them understand people's credit risk and make better-informed lending decisions. FICO Scores have been an industry standard since they were first introduced over 30 years ago.

44.     On its website, Fair Isaac claims that "10 billion FICO Scores are purchased every year" and "27 million Fico Scores are purchased every day." FICO Scores are also used in over 30 countries.

45.     Fair Isaac's also advertises that its FICO Score is "widely accepted" and "used by 90% of top U.S. lenders."  FICO Scores have been "an industry standard for over 30 years."

46.     Fair Isaac's executives have confirmed the dominance of Fair  Isaac's  FICO Score. In November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President Michael Pung stated that the FICO scoring system "is the most widely used credit scoring system here in the U.S.," that "[v]irtually every major lender in the U.S. [uses] the FICO Score for some sort of credit lending decision," and that Fair Isaac has "maintained a 90-plus percent market share for at least the [last] 13 years."

47.     Fair Isaac's monopoly in the Business Market for credit scores has given it considerable power to control prices. Fair Isaac's CEO Will Lansing has noted that, in the Business Market for credit scores, Fair Isaac has significant discretion to raise or lower its margins.

### D.     Fair Isaac Has Been Able to Maintain its Monopoly

48.     Despite Fair Isaac's 90% share in the Business Market, several companies have attempted to compete with Fair Isaac's FICO Scores. These competitors' products use the same data as FICO Scores.  However, many also incorporate data not used by FICO Scores—data such

as, rental, utility, and telecom payment data and/or public records information, such as property deeds, mortgages, liens, personal property titles, tax records, and licensing data.

49.     Some of these competitors to Fair Isaac's FICO Scores in the Business Market for credit scores include: SageStream's Credit Optics Score; LexisNexis's RiskView score; CoreLogic Credco's Anthem Credit Score; PRBC; ChexSystems; L2C's Link2Credit Score; and ScoreLogix LLC's JSS Credit Score.

50.     Another competitor, VantageScore Solutions, represented the biggest threat to Fair Isaac's FICO Scores in the Business Market because it was backed by the three major CRAs. As part of its attempt to compete against Fair Isaac's FICO Scores in the Business Market, VantageScore Solutions introduced the VantageScore credit scoring system in March 2006.

51.     In addition to being backed by the three major CRAs, the VantageScore credit scoring model provides reliable credit scores for millions more consumers than FICO Scores by relying on additional and alternative sources of data. VantageScore, for example, calculates scores for consumers who have not used credit for up to two years and use utility and telecommunications payment histories. As such, VantageScore provides insights into individuals' and businesses' desirability as customers, clients, and/or tenants that Fair Isaac's FICO Scores cannot. In contrast, Fair Isaac's FICO scoring systems do not generate a score if a consumer does not have at least one credit account that has been open for six months or more, or if no credit account of the consumer has been reported to the reporting CRA.  Thus, millions of otherwise creditworthy individuals do not have a FICO Score.

52.     Furthermore, it is widely recognized that FICO Scores are a measure of past ability to pay. Competing products incorporate an analysis of prospective creditworthiness.  For example, Scorelogix's JSS score incorporates job and income stability to determine whether the

borrower will have the ability to repay debt in the future. L2C offers an alternative credit score that uses utility payment histories to determine creditworthiness, including future ability to pay.

53.     Presently, VantageScore scores 30 million more Americans than traditional FICO Scores. Fair Isaac's outdated FICO Classic credit scoring systems excludes many creditworthy Americans that VantageScore and other competing credit scoring models can reliably score. Nationally, nearly 65 million adults do not have a traditional FICO Score. VantageScore is capable of reducing the number of adults without a credit score by almost half. An estimated ten million of those individuals are "prime" borrowers who are attractive to businesses as customers, counterparties, and tenants.

54.     Obtaining a mortgage, car loan, credit card or reasonable interest rates on personal lines of credit is almost impossible without a credit score. Landlords are also increasingly screening potential tenants using credit scores. Thus, those excluded by Fair Isaac's traditional FICO scoring systems--including a disproportionate number of low-income and minority consumer--face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and housing.

55.     VantageScore alone calculates a score for 9.5 million Hispanic and Black consumers who do not have a FICO Score, including an estimated 2.7 million minority consumers who should be considered "prime" borrowers.

56.     Despite the advantages of using VantageScore or another competing credit scoring model, Fair Isaac continues to have a monopoly in the Business Credit Score Market. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO Will Lansing explained that despite the existence of VantageScore, "there [is] not that much competition around our Scores business" because "FICO Scores are very much part of the fabric of the banking industry" and

"really deeply embedded."

### E.      Fair Isaac's Conduct in Furtherance of its Anticompetitive Scheme

57.      Business customers in the Business Market purchase credit reports and FICO Scores from CRAs. As part of this process, CRAs have entered into contractual relationships, called "Credit Scoring Services Agreements" ("CSSAs"), with their customers that govern the terms by which businesses purchase FICO Scores.  These terms include the amount(s) paid to the CRA, the fee model for delivery of credit score services, the method of payment, the mode of delivery, and restrictions on the business's use of FICO Scores.

58.      The CRAs and Fair Isaac have entered into separate contracts which set forth the royalties that CRAs must pay to Fair Isaac for the FICO Scores that the CRAs sell to their customers. These royalties are passed on to Plaintiff and other class members.

59.      Taking advantage of its dominant position in the Business Market for credit scores, Fair Isaac has used and continues to use the CRAs to maintain and extend its monopoly. Fair Isaac is dependent on CRAs' relationship with business customers in the Business Market for credit scores. As such, Fair Isaac has used contractual term in its agreements with CRAs to further its anticompetitive scheme.

60.      For example, in January 2015, Fair Isaac and TransUnion entered into a new contract, the Analytic and Data License Agreement ("ADLA"). TransUnion's prior contracts with Fair Isaac were set to expire on December 31, 2014.  Fair Isaac leveraged this situation to demand that the parties enter into a new contract rather than renewing their existing contracts. Fair Isaac represented to TransUnion that Equifax and Experian already had agreed to materially similar new contracts with Fair Isaac. If TransUnion did not agree to the terms demanded by Fair Isaac, it would lose substantial business from customers that depend on FICO Scores. On

information and belief, Equifax, Experian, and TransUnion all agreed to Fair Isaac's plan to exclude competitors and maintain its monopoly.

61.    In furtherance of its efforts to eliminate competition, Fair Isaac inserted anticompetitive terms into its contracts with the three major CRAs—Equifax, Experian, and TransUnion. These agreements effectively prevent the three major CRAs, who jointly own VantageScore, from developing or selling alternative credit scores that could be used interchangeably with FICO Scores and competing against each other to establish lower prices from Fair Isaac

62.    The contracts also contain a pricing scheme that in effect forecloses business customers in the Business Market from choosing to use FICO Scores for their own internal business use while also providing a VantageScore or other alternative to FICO Scores to their customers.

63.    Not only did Fair Isaac use contractual terms to further its anticompetitive conduct, Fair Isaac engaged in a media campaign against VantageScore and other credit scoring alternatives that included making false and misleading statements about these alternatives in an effort to sow doubt about VantageScore's and other credit scoring systems' reliability.

64.    Fair Isaac's conduct has inhibited competition in the Business Market for credit scores and had the effect of artificially inflating the prices that Plaintiff and other business customers must pay CRAs for FICO Scores.

### a.    Fair Isaac's Anticompetitive Contracts with CRAs

### i.        The "No Equivalent Products Clause"

65.    The "No Equivalent Products" clause is located at Section 12.5 of the ADLA between Fair Isaac and TransUnion.  This clause provides that TransUnion may not "internally

develop" a credit scoring system that is "aligned to the odds-to-score relationship of any Fair Isaac Analytic" or uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. Section 12.5 of the ADLA further prohibits TransUnion from distributing "any competing analytic" (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes. The Section also expressly names VantageScore Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

66.     On information and belief, Fair Isaac has imposed similar or identical "No Equivalent Products" clauses on Equifax and Experian. Thus, these CRAs have agreed to and acquiesced in these anticompetitive agreements and the resulting anticompetitive effects.

67.     Fair Isaac's "No Equivalent Products" clause has effectively blocked the CRAs from offering alternative credit scoring products, such as VantageScores, which would allow business customers in the Business Market to switch from FICO Scores without incurring the significant switching costs that using a new scoring system would entail.  It also prevents the use of VantageScore or other credit scoring systems alongside or interchangeably with FICO Scores without the business customer incurring those same switching costs.

68.     For example, if an alternative credit scoring product such as VantageScore used a score of 700 to indicate a less-than-five-percent risk of credit delinquency, and if a FICO Score of 700 also indicated the same risk of delinquency, the "No Equivalent Products" clause would prevent a CRA from distributing the competing product. Similarly, if a competing credit score product used reason codes that match 20% of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause would prohibit a CRA from distributing the product.

69.     Due to years of Fair Isaac's dominance, many business customers of credit scores

have modeled and designed their internal systems for FICO Scores. These business customers' systems, models, and processes are calibrated to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). In example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data that it collects internally, and automatically produce a lending decision. The "No Equivalent Products" clause effectively prohibits the CRAs from selling an alternative to FICO's credit scores since those scores would have to be incompatible with many businesses' existing systems. Thus, they are prevented from providing business customers a legitimate choice between using FICO Scores and an alternative score.

70.    Notably, the "No Equivalent Products" clause does not sustain Fair Isaac's intellectual property. Rather, it protects and sustains Fair Isaac's monopoly. For example, the odds-to-score relationship is not protectable intellectual property. It is the arbitrary assignment of a number (score) to a related risk probability. The intellectual property entitled to protection in this product market is the analysis and the process used to predict a consumer's risk of default, not the shorthand numerical representation of a "less than-five-percent-risk-of- default" as "700."

71.    Similarly, the reason codes that are prohibited from matching Fair Isaac's, under the "No Equivalent Products" clause, were not invented by Fair Isaac. Rather, there is an established set of reason codes that reflect well-established industry measures of creditworthiness.

### ii.    The "Pre-Qualification" Royalty Rates

72.    As an incentive, some businesses customers in the Business Market for credit

scores provide to their consumer customers, whom they are often offering credit, the opportunity to receive their personal credit score. This can serve as a valuable marketing tool for the business customers.

73.     In 2015, Fair Isaac inserted a new "Pre-Qualification" royalty category into its contracts with CRAs. "Pre-Qualification" is defined as "an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category created a distinction between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any credit score or credit data to consumers, and (2) lenders that use FICO Scores for "Pre-Qualification" and also provide credit scores or credit data to consumers "in connection" with the "Pre-Qualification."

74.     Under Fair Isaac's contracts with the CRAs, the royalty price paid to Fair Isaac for use of its FICO Score for "Pre-Qualification" is directly tied to whether credit scores or credit data are provided to consumers. There is a lower per-score royalty rate if a business customer purchases a FICO Score for use in "Pre-Qualification" and does not provide any credit score or credit data to their consumer customer "in connection" with the "Pre-Qualification." If the business customer does provide a VantageScore or any other credit score to the consumer "in connection" with the "Pre- Qualification," the per-score royalty rate that is significantly higher.

75.     The higher royalty rate can only be avoided if the business customer exclusively purchases FICO Scores. One way to avoid paying the higher royalty rate is for the business customer to purchase the FICO Score but not provide a credit score or credit data to the consumer. A second way to avoid the higher royalty rate requires the busines customer to purchase a bundled FICO product from Fair Isaac and provide the bundled FICO Score to its consumer customer. Fair Isaac offers bundled products to lenders that combine the use of scores

designed for use by business customers with the provision of scores to their consumer customers.

76.     The only reason for the higher royalty rate is to force all business customers that participate in "Pre-Qualification" to purchase FICO Scores alone and make it cost prohibitive for business customers that engage in "Pre-Qualification" to provide an alternative credit score to its consumers. There is no legitimate business justification for the higher royalty rate Fair Isaac charges for FICO Scores when the business customer also purchases a competing credit score to provide its consumer customers.  The higher royalty rate has anticompetitive effects and has assisted Fair Isaac in maintaining its monopoly position as, on information and belief, few, if any, business customers have opted to pay the higher royalty rate.

### iii.  The "Dynamic Royalty Schedule" and "Level Playing Field"

77.     The "Dynamic Royalty Schedule" is detailed in Section 9.2 of the ADLA between Fair Isaac and TransUnion.  This provision states that "once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing."

78.     The "Level Playing Field" section of the ADLA between Fair Isaac and TransUnion is located in Section 9.16. This provision mandates that the prices that are made available to TransUnion will also be made available to other CRAs.

79.     On information and belief, Fair Isaac's contracts with Equifax and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" clauses.

80.     Collectively, the "Dynamic Royalty Schedule" and "Level Playing Field" clauses allow Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores.

81.     The "Level Playing Field" and "Dynamic Royalty Schedule" clauses disincentivize CRAs from negotiating for lower royalty prices for Fair Isaac's FICO Scores,

because the CRAs will not obtain a competitive advantage if they were to obtain lower pricing for royalty rates. This anticompetitive result is the sole intended purpose and effect of the "Level Playing Field" provision. The "Level Playing Field" clause does not provide Fair Isaac with any rights it does not have. Fair Isaac could offer the same royalty rates to all CRAs absent the clause. The "Level Playing Field" clause exists only to inform the CRAs that negotiating for lower prices is useless.

82.     Fair Isaac has used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in its contracts with CRAs for anticompetitive purposes and to extract monopoly prices from all business customers in the Business Market.

**b.  Fair Isaac's Negative Advertising Campaign in Furtherance of its Scheme**

83.     In addition to imposing anticompetitive contractual provisions on CRAs, Fair Isaac also engaged in an advertising campaign that disseminated false and misleading information with the goal of maintaining its monopoly in the Business Market for credit scores. In advertisements, letters, and blog posts, Fair Isaac disparaged VantageScore and other credit scoring systems by calling them "Fako" scores, falsely claimed that VantageScore and other alternative scoring systems do not reliably measure creditworthiness, and misrepresented the information considered by VantageScore and other credit scoring systems.

84.     For example, on December 12, 2017 Fair Isaac took out a full-page advertisement in the *Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates." This advertisement that attacked VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the (CRAs)" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative credit score, which the is owned by CRAs.  According to the advertisement the credit score owned by CRAs

(impliedly VantageScore) is less reliable than FICO Scores in evaluating credit risk and does not use "sound practices" or "science-based credit evaluation." This advertisement conveyed Fair Isaac's false message that VantageScore is "Weakening scoring standards, [and] harm[ing] consumers, and the lending system."

85.     Furthermore, the *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that links visitors to articles and blog posts that disparage VantageScore by name. One of these blog post claims: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

86.     Another example or Fair Isaac's false and misleading advertising campaign can be found on its website where a blog post claims that "Research results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This statement is false and misleading. VantageScore and other scoring models consider an individual consumer or business's full credit and financial history, even if the consumer has not used a traditional credit line in the last six months. Further, studies have shown that VantageScore and other competing credit scoring models are strongly predictive.

87.     Fair Isaac has also initiated litigation against Equifax, Experian, TransUnion, and VantageScore Solutions.  In 2006, just after the introduction of VantageScore, Fair Isaac filed a meritless lawsuit against them, alleging that the development of VantageScore violated the antitrust laws and constituted trademark infringement. Fair Isaac sought the elimination of VantageScore Solutions requesting that the "Defendants be ordered to dissolve VantageScore." *Fair Isaac Corp. v. Equifax, Inc. et al*, No. 0:06-cv-04112, ECF No. 1-1 at 65 (D. Minn. Oct.

11, 2006). This frivolous lawsuit represented Fair Isaac's first attempt to kill VantageScore before it could gain traction in the market.

88.     Not only did Fair Isaac's lawsuit fail, the jury concluded that Fair Isaac was the wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it was similar to FICO's scoring range of 300-850. The CRAs and VantageScore Solutions counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range. The jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as part of its application to register the score range of 300-850 as a trademark.

89.     Nonetheless, Fair Isaac's smear campaign against VantageScore has been successful in sowing doubt about the reliability and accuracy of credit scoring alternatives to FICO Scores. For example, a media outlet devoted to personal finance issues, thebalance.com, posted in February 2017 that, "If you purchased your credit score from anywhere but MyFICO.com, then it's a Fako score."

90.     The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

### F.     Fair Isaac's Anticompetitive Conduct Has Harmed Competition

91.     Fair Isaac's anticompetitive conduct has harmed and continues to harm business customers in the Business Market for credit scores. Fair Isaac's unlawful conduct, including conduct taken in concert with the CRAs, has foreclosed competition in the Business Market by eliminating fair opportunities for the major CRAs to sell VantageScore or any other competing credit score product to business customers.

92.     Fair Isaac's conduct, including demanding anticompetitive clauses in its contracts with CRAs, reduced choice for business customers in the Business Market for credit scores and frustrated the ability of business customers to purchase VantageScore or any other competing credit score.   As a direct and proximate result of Fair Isaac's exclusionary and anticompetitive conduct, Fair Isaac has been able to indirectly charge Plaintiff and all similarly situated businesses supracompetitive prices for credit scores. As buyers of Fair Isaac's FICO Scores, Plaintiff and all similarly situated business have been harmed by Fair Isaac's supracompetitive royalty prices.

93.     Fair Isaac's sales in the Business Market over the past five fiscal years are extremely profitable. Fair Isaac maintains a supracompetitive profit margin on the revenue it earns from its Business Credit Scoring Products. Plaintiff and similarly situated businesses have vastly overpaid for FICO Scores due to Fair Isaac's anticompetitive activities.

## V.      CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All end-user business customers who, during the Class Period, indirectly purchased a FICO Score in the Business Market for credit scores for use and not for resale from January 1, 2006 through the present.

95.     Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws, as well as the law of unjust enrichment on behalf of the following class (the "Damages Class"):

> All end-user business customers who, during the Class Period and

in Indirect Purchaser States,[1] indirectly purchased a FICO Score in the Business Market for credit scores for use and not for resale from January 1, 2006 through the present.

96.     The Nationwide Class and the Damages Class are referred to herein as the "Classes."

97.     These class definitions exclude any and all natural persons are not members of these Classes by their definitions. Also excluded from the Classes are the Defendant, its parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased FICO Scores directly or for resale.

98.     While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believes there are at least thousands of members in each Class. Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in the possession of Defendant.

99.     Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and members of the Classes were damaged by the same wrongful conduct of Defendant.

100.    The interests of Plaintiff are coincident with, and not antagonistic to, those of members of the Classes.

---

[1] The "Indirect Purchaser States" are the states and Districts listed in the Third and Fourth Claims for Relief, specifically, Arizona, Arkansas, California, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

101.    Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

102.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Classes as a whole appropriate. Questions of law and fact common to members of the Classes include, but are not limited to:

a.    whether Defendant contracted, monopolized or unreasonably restrained trade in violation of federal law;

b.    whether Defendant monopolized or unreasonably restrained trade in violation of certain state antitrust laws;

c.    whether Defendant engaged in unfair or deceptive trade practices in violation of certain state laws;

d.    whether the Defendant unjustly enriched itself to the detriment of Plaintiff and members of the Classes, thereby entitling Plaintiff and members of the Classes to disgorgement of all benefits derived by Defendant;

e.    the duration of the alleged unlawful conduct;

f.    injury suffered by Plaintiff and members of the Classes;

g.    damages suffered by Plaintiff and members of the Classes; and

h.    whether Defendant has acted or refused to act on grounds generally applicable to members of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Classes as a whole.

103.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

104.    The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

105.    The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

106.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

107.    Defendant has acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

108.    Plaintiff has defined members of the Classes based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.    STATUTES OF LIMITATION AND TOLLING

109.    Plaintiff repeats and re-alleges the allegations set forth above.

110.    Fair Isaac, aware of its illegal scheme to maintain and extend its monopoly in the Business Market for credit scores and its injurious effects on business customers, fraudulently concealed the scheme by failing to report it while reaping illicit profits from the inflated prices it charged.

111.    The anticompetitive agreements between Fair Isaac and the CRAs were not discoverable until TransUnion filed its counterclaims against Fair Isaac in February 2018. The Agreements remain secret, and Plaintiff and the members of the Classes had no way of knowing

27

the terms of the agreements between Fair Isaac and the CRAs until after they were alleged in TransUnion's filings.

112. Plaintiff and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of the facts sufficient to place them on inquiry notice of the claims set forth herein. Defendant's unlawful self-concealing scheme could not have been discovered through the exercise of reasonable diligence more than four years before the filing of this complaint. This is true because the nature of Defendant's scheme was self-concealing and because Fair Isaac employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, its anticompetitive scheme.

113. Fair Isaac wrongfully and affirmatively concealed the existence of its ongoing scheme from Plaintiff and members of the Classes by, among other things:

    a. Concealing the fact of the CRAs' agreement, through the "No Equivalent Products" clause, not to internally develop a competing credit scoring system that is aligned with FICO Scores or uses too many of the same reason codes;

    b. Concealing the fact that the purpose of the "No Equivalent Products" agreement is to block the CRAs from offering credit scoring products that would allow business consumers a legitimate choice between FICO Scores and VantageScore or another alternative scoring product, thereby protecting and sustaining Fair Isaac's monopoly;

    c. Concealing the fact of its agreement with each of the CRAs, through the "Level Playing Field" and "Dynamic Royalty Schedule" clauses, to require that prices made available to one CRA be made available to all the others;

    d. Concealing the fact that the purpose of the "Level Playing Field" and "Dynamic Royalty Schedule" clauses is to disincentivize each CRA from negotiating lower royalty prices for FICO Scores; and

    e. Filing documents with the United States Securities and Exchange Commission that failed to disclose the existence or nature of these anticompetitive agreements.

114. Plaintiff and members of the Classes also lacked the facts and information

necessary to form a good faith basis for believing that any legal violations had occurred.

115. Reasonable diligence on the part of Plaintiff and members of the Classes would not have uncovered those facts more than four years before the filing of this complaint.

116. As a result of Defendant's affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiff and members of the Classes have been and are tolled, and Defendant is equitably estopped from raising statutes of limitations as a defense.

117. Any applicable statutes of limitations were tolled at least until February 12, 2018, the date that TransUnion filed its Counterclaim against Defendant in *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill.).

118. The federal government's initiation of its antitrust investigation of Defendant's unlawful conduct also operates to toll any federal statute of limitations under 15 U.S.C. § 16.

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act 15 U.S.C. § 1
### (On behalf of Plaintiff and the Nationwide Class
### for Injunctive and Equitable Relief)

119. Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

120. The Business Market for credit scores in the United States constitutes the relevant market.

121. Fair Isaac has had and continues to have at least a 90% market share in the Business Market for credit scores in the United States.

122. Fair Isaac has had and continues to have monopoly power in the Business Market for credit scores in the United States.

123.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the Business Market for credit scores in the United States.

124.    Fair Isaac entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Specifically, Fair Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms that were designed to eliminate Fair Isaac's competitors and to keep prices for FICO Scores artificially high.

125.    The agreements between Fair Isaac and the CRAs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

126.    The agreements between Fair Isaac and the CRAs raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

127.    The acts done by Fair Isaac as part of, and in furtherance of, its contract, combination, or conspiracy were authorized ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

128.    The anticompetitive acts were directed at the Business Market for credit scores in the United States and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

129.    Fair Isaac's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

130.    Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property, and Plaintiff and all other similarly situated businesses will continue to suffer such damages if Fair Isaac does not cease its anticompetitive conduct.

131.    Plaintiff and all other similarly situated businesses are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Sections 1 and 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

132.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

133.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendant, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of Section 2 of the Sherman Act 15 U.S.C. § 2
### (On behalf of Plaintiff and the Nationwide Class
### for Injunctive and Equitable Relief)

134.    Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint.

135.    The Business Market for credit scores in the United States constitutes the relevant market.

136.    Fair Isaac has had and continues to have at least a 90% market share in the Business Market for credit scores in the United States.

137.    Fair Isaac has had and continues to have monopoly power in the Business Market for credit scores in the United States.

31

138.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the Business Market for credit scores in the United States.

139.    Fair Isaac entered Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms that were designed to eliminate Fair Isaac's competitors and to keep prices for FICO Scores artificially high.

140.    The agreements between Fair Isaac and the CRAs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

141.    The agreements between Fair Isaac and the CRAs raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

142.    The acts done by the Fair Isaac as part of, and in furtherance of, its contract, combination, or conspiracy were authorized ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

143.    The anticompetitive acts were directed at the Business Market for credit scores in the United States and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

144.    Fair Isaac's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

145.    Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property, and Plaintiff and all other similarly

situated businesses will continue to suffer such damages if Fair Isaac does not cease its anticompetitive conduct.

146. Plaintiff and all other similarly situated businesses are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Sections 1 and 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

147. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

148. Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendant, preventing and restraining the violations alleged herein.

### THIRD CLAIM FOR RELIEF
### Violation of State Antitrust Statutes
### (on behalf of Plaintiff and the Damages Class)

149. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

150. Defendant's anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

151. By reason of the conduct alleged herein, Defendant has violated Arizona Rev. Stat. § 44-1401, *et seq.*

    (a)    Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Arizona.

33

(b)     Defendant's combinations or conspiracies had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arizona; (2) credit score prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

(d)     During the Class Period, Defendant's illegal conduct substantially affected Arizona commerce.

(e)     By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

(f)     Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

(g)     As a direct and proximate cause of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business or property and are threatened with further injury.

(h)     By reason of the foregoing, Plaintiff and members of the Damages Class are entitled to seek all forms of relief available under Arizona Revised Statute §

34

44-1401, *et seq.*

(i)     In conjunction with the filing of this Complaint, Plaintiff has served a copy of this Complaint on the Arizona Attorney General in accordance with Ariz. Rev. Stat. Ann. § 44-1415. Plaintiff will file proof of such service with the Court.

152.    By reason of the conduct alleged herein, Defendant has violated California Business and Professions Code, §§ 16700, *et seq.*

(a)     The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

(b)     California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

(c)     Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

(d)     A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

(e)     Defendant entered into a contract, combination, or

conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within California.

(f)     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

(g)     Plaintiff Garner Properties & Management and members of the Damages Class purchased FICO Scores within the State of California during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

(h)     Defendant enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

(i)     Plaintiff and members of Damages Class were injured in their business or property, with respect to purchases of FICO Scores in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

153.    By reason of the conduct alleged herein, Defendant has violated District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade).

(a)     Defendant contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the

Business Market for credit scores within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected District of Columbia commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

(f)     Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28- 4509(a).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

37

154. By reason of the conduct alleged herein, Defendant has violated the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

(a) Members of the Illinois Damages Class purchased FICO Scores within the State of Illinois during the Class Period.

(b) But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

(c) Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. Ann. 10/7(2).

(d) Defendant entered into contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling or maintaining prices for FICO Scores sold within the State of Illinois.

(e) Defendant further unreasonably restrained trade or commerce and established, maintained, or attempted to acquire monopoly power over the Business Market for credit scores in Illinois for the purpose of excluding competition, in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

(f) Members of the Illinois Damages Class were injured with respect to purchases of FICO Scores in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

155. By reason of the conduct alleged herein, Defendant has violated the Iowa Competition Law, Iowa Code § 553.1, *et seq.*

(a) Defendant contracted, combined or conspired to restrain or

monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Iowa Code § 553.1, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected Iowa commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq.*

(f)     Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449 (Iowa 2002).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

156.    By reason of the conduct alleged herein, Defendant has violated Kan. Stat. Ann. § 50-101, *et seq.*

(a)    Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(b)    Defendant combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of credit scores, increasing the price of credit scores, or preventing competition in the sale of credit scores, in a manner that established the price of credit scores and precluded free and unrestricted competition among themselves in the sale of credit scores, in violation of Kan. Stat. Ann. § 50-101, *et seq*

(c)    During the Class Period, Defendant's illegal conduct substantially affected Kansas commerce.

(d)    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50- 101, *et seq.*

(f)    Under the Kansas Restraint of Trade Act, indirect purchasers have

40

standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

157.     By reason of the conduct alleged herein, Defendant has violated Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

(a)     Defendant contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of credit scores within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Maine; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected Maine commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

41

(e)    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(f)    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

(g)    Accordingly, Plaintiff and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

158.    By reason of the conduct alleged herein, Defendant has violated the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)    Defendant contracted, combined or conspired to restrain or monopolize trade or commerce in the Business Market for credit scores, in violation of Mich. Comp. Laws § 445.771, *et seq.*

(b)    Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)    During the Class Period, Defendant's illegal conduct substantially affected Michigan commerce.

(d)    As a direct and proximate result of Defendant's unlawful

conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

(f)    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 445.778(2).

(g)    Accordingly, Plaintiff and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

159.    By reason of the conduct alleged herein, Defendant has violated the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

(a)    Defendant contracted, combined or conspired in unreasonable restraint of trade or commerce in the Business Market for credit scores within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the Business Market for credit scores within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for credit scores within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq.*

(b)    Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and

43

eliminated throughout Minnesota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected Minnesota commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.

(f)     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.57.

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

160.     By reason of the conduct alleged herein, Defendant has violated Mississippi Code Annotated §§ 75-21-1, *et seq*.

(a)     Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Mississippi.

44

(b)     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

(c)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(d)     During the Class Period, Defendant's illegal conduct substantially affected Mississippi commerce.

(e)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

(g)     Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

(h)     Accordingly, Plaintiff and members of the Damages Class seek all

45

relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

161.  By reason of the conduct alleged herein, Defendant has violated Mo. Ann. Stat. § 407.010, *et seq.*

(a)  Defendant contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the Business Market for credit scores within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq.*

(b)  Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)  During the Class Period, Defendant's illegal conduct substantially affected Missouri commerce.

(d)  As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)  By reason of the foregoing, Defendant has entered into agreements

in restraint of trade in violation of Mo. Ann. Stat. § 407.010, *et seq.*

(f)     Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2008).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Mo. Ann. Stat. § 407.010, *et seq.*

162.     By reason of the conduct alleged herein, Defendant has violated the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendant contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the Business Market for credit scores within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially

47

affected Nebraska commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*

(f)     Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

163.    By reason of the conduct alleged herein, Defendant has violated the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)     Defendant contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected Nevada commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

(f)     Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

164.    In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by Plaintiff.

165.    By reason of the conduct alleged herein, Defendant has violated the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)     Defendant fixed, controlled or maintained prices for credit scores, allocated customers or markets for credit scores, and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected New Hampshire commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.*

(f)     Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

166.    By reason of the conduct alleged herein, Defendant has violated the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)     Defendant contracted, agreed, combined or conspired, and

50

monopolized or attempted to monopolize trade for credit scores within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected New Mexico commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

(f)     Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3(A).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

167.    By reason of the conduct alleged herein, Defendant has violated the New York

51

General Business Laws §§ 340, *et seq.*

(a)     Defendant established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of credit scores and restrained competition in the free exercise of the conduct of the business of credit scores within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New York; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected New York commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act.

(f)     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law §

340(6).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

168.    By reason of the conduct alleged herein, Defendant has violated the North Carolina General Statutes §§ 75-1, *et seq*.

(a)     Defendant contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of North Carolina General Statutes §§ 75-1, *et seq*.

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected North Carolina commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements

53

in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.

(f)     Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

169.    By reason of the conduct alleged herein, Defendant has violated the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)     Defendant contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendant's violations of North Dakota law were flagrant.

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected North Dakota commerce.

54

(d)    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

(f)    Under North Dakota law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *See*, *e.g.*, *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 298 (N.D. 2003).

(g)    Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

170.    By reason of the conduct alleged herein, Defendant has violated the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)    Defendant contracted, combined, or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, in violation of Or. Rev. Stat. § 646.705, *et seq.*

(b)    Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)    During the Class Period, Defendant's illegal conduct substantially

affected Oregon commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*

(f)     Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

171.     By reason of the conduct alleged herein, Defendant has violated R.I. Gen. Laws § 6-36-1, *et seq.*

(a)     Defendant contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected Rhode Island commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

(f)     Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under R.I. Gen. Laws § 6-36-1, *et seq.*

172.    By reason of the conduct alleged herein, Defendant has violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

(a)     Defendant contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of credit scores within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1-3.1, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and

eliminated throughout South Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected South Dakota commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

(f)     Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

173.     By reason of the conduct alleged herein, Defendant has violated the Tennessee Code Annotated §§ 47-25-101, *et seq*.

(a)     Defendant contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding

58

competition or controlling, fixing or maintaining prices for credit scores, in violation of Tenn. Code, § 47-25-101, *et seq.*

(b)      Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)      During the Class Period, Defendant's illegal conduct substantially affected Tennessee commerce.

(d)      As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)      By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*

(f)      Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

(g)      Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25- 101, *et seq.*

174.     By reason of the conduct alleged herein, Defendant has violated Utah Code

Annotated §§ 76-10-3101, *et seq.*

(a)     Defendant contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Utah; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected Utah commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.*

(f)     Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

175.    By reason of the conduct alleged herein, Defendant has violated Vermont Stat. Ann. 9 §§ 2453, *et seq.*

(a)     Defendant contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Defendant's violations of Vermont law were flagrant.

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially affected Vermont commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements

61

in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*

(f)     Under Vermont law, indirect purchasers have standing to maintain an action under Vermont's antitrust laws based on the facts alleged in this Complaint. *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

176.    By reason of the conduct alleged herein, Defendant has violated West Virginia Code §§ 47-18-1, *et seq.*

(a)     Defendant contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of West Virginia Code §§ 47-18-1, *et seq.* Defendant's anticompetitive acts were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(c)     During the Class Period, Defendant's illegal conduct substantially

affected West Virginia commerce.

(d)     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*

(f)     Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. Va. Code R. 142-9-2.

(g)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

177.    By reason of the conduct alleged herein, Defendant has violated Wisconsin Statutes §§ 133.01, *et seq.*

(a)     Defendant contracted, combined or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq.*

(b)     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially

inflated prices for credit scores.

       (c)    During the Class Period, Defendant's illegal conduct substantially affected Wisconsin commerce.

       (d)    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

       (e)    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

       (f)    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(1)(a).

       (g)    Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

178.    Defendant's anticompetitive activities have directly, foreseeably and proximately caused injury to members of the Damages Class. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced credit scores from Defendant and/or other sellers of credit scores, and (2) paying higher prices for FICO Scores than they would have in the absence of Defendant's conduct. These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes Defendant's conduct unlawful.

179.    In addition, Defendant has profited significantly from the aforesaid conspiracy. Defendant's profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiff and the members of the Damages Class.

64

180.    Accordingly, Plaintiff and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable),  to  be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### FOURTH CLAIM FOR RELIEF
### Violations of State Consumer Protection Laws
### (on behalf of Plaintiff and the Damages Class)

181.    Defendant engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

182.    Defendant has knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

(a)    Defendant knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which credit scores were sold in Arkansas and took efforts to conceal its agreements from Plaintiff and members of the Damages Class.

(b)    The aforementioned conduct on the part of the Defendant constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)    Defendant's unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and the

members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(d)     During the Class Period, Defendant's illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of Defendant, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute

183.    Defendant has engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq.

(a)     During the Class Period, Defendant marketed, sold, or distributed FICO Scores in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     The violations of federal antitrust law set forth above constitute violations of section 17200, *et seq.* of California Business and Professions Code.

(c)     This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from this Defendant for acts, as alleged herein, that violated the UCL.

(d)     Defendant's conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendant, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

(e)     Defendant's acts, omissions, misrepresentations, practices, and non- disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

(f)     Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business acts or practices.

(g)     The illegal conduct alleged herein is continuing and there is no indication that Defendant will not continue such activity into the future.

(h)     The unlawful and unfair business practices of Defendant, as described above, have caused and continue to cause Plaintiff and members of the

67

Damages Class to pay supra-competitive and artificially-inflated prices for FICO Scores sold in the State of California. Plaintiff and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(i) As alleged in this Complaint, Defendant and its co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendant's unfair competition.

(j) Plaintiff and members of the Damages Class are accordingly entitled to equitable relief.

184. Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a) The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

(b) A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

(c) Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

(d) Members of the Damages Class purchased FICO Scores

within the State of Florida during the Class Period. But for Defendant's conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

(e)     Defendant entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Florida.

(f)     Defendant established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2006 and continuing through the date of this filing.

(g)     Accordingly, Defendant's conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

(h)     Defendant's unlawful conduct substantially affected Florida's trade and commerce.

(i)     As a direct and proximate cause of Defendant's unlawful conduct, members of the Class have been injured in their business or property by virtue of overcharges for FICO Scores and are threatened with further injury.

(j)     By reason of the foregoing, the members of the Damages Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. § 501.208 and declaratory judgment, actual damages, reasonable

attorneys' fees and costs pursuant to Florida Stat. § 501.211.

185.    Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

(a)      Defendant's unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(b)      During the Class Period, Defendant's illegal conduct substantially affected Hawaii commerce and consumers.

(c)      As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury.

(d)      Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

186.    Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A, §2A.

(a)      Defendant was engaged in trade or commerce as defined by

G.L. c. 93A.

(b)        Defendant agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which credit scores were sold, distributed, or obtained in Massachusetts and took efforts to conceal its agreements from Plaintiff and members of the Damages Class.

(c)        Defendant's unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

(d)        As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class were injured and are threatened with further injury.

(e)        The Defendant has or will be served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

(f)        By reason of the foregoing, Defendant engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A,

§2.  Defendant's violations of Chapter 93A were knowing or willful, entitling Plaintiff and members of the Damages Class to multiple damages.

187.    Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.* N

(a)      Plaintiff and the Damages Class purchased FICO Scores for personal, family, or household purposes.

(b)      Defendant engaged in the conduct described herein in connection with the sale of credit scores in trade or commerce in a market that includes Missouri.

(c)      Defendant agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which credit scores were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class.

(d)      Defendant concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Damages Class concerning Defendant's unlawful activities and artificially inflated prices for credit scores. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of credit scores they purchased.

(e)      Defendant's conduct concerning the price of credit scores

was deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing credit scores at prices established by a free and fair market.

(f)     Defendant's unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

(g)     The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(h)     As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property.

(i)     Accordingly, Plaintiff and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-

73

9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

188.    Defendant has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq.*

(a)    Defendant's unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Montana; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

(b)    During the Class Period, Defendant's illegal conduct substantially affected Montana commerce and consumers.

(c)    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury.

(d)    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

189.    By reason of the conduct alleged herein, Defendant has violated Neb. Rev. Stat. § 59-1602, *et seq.*

(a)     Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-1609.

(b)     Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Nebraska.

(c)     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

(d)     Defendant's conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendant's actions within the stream of Nebraska commerce.

(e)     Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

(f)     Defendant's conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiff and members-of-the-Class's ability to protect themselves.

(g)     Defendant's unlawful conduct substantially affected Nebraska's trade and commerce.

(h)     As a direct and proximate cause of Defendant's unlawful conduct, members of the Class have been injured in their business or property and are threatened

with further injury.

(i)     By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1602, *et seq.*

190.    By reason of the conduct alleged herein, Defendant has violated N.H. Rev. Stat. T. XXXI, § 358-A, *et seq.*

(a)     Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

(b)     Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Hampshire.

(c)     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business market for credit scores, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

(d)     Defendant's conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendant's actions within the stream of New Hampshire commerce.

(e)     Defendant's conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

(f)     Defendant's conduct was willful and knowing.

(g)     Defendant's conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

(h)     Defendant's unlawful conduct substantially affected New Hampshire's trade and commerce.

(i)     As a direct and proximate cause of Defendant's unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

(j)     By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under N.H. Rev. Stat. T. XXXI, §§ 358-A:10 and 358-A:10-a.

191.    By reason of the conduct alleged herein, Defendant has violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

(a)     Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico.

(b)     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

(c)     Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

(d)     Defendant's conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and the members of the Damages Class.

(e)     Defendant's unlawful conduct substantially affected New Mexico's trade and commerce.

(f)     Defendant's conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the members of the Class and the price paid by them for FICO Scores as set forth in N.M. Stat. Ann. § 57-12-2E.

(g)     Defendant's conduct was willful.

(h)     As a direct and proximate cause of Defendant's unlawful conduct, Plaintiff and the members of the Damages Class have been injured in their business or property and are threatened with further injury.

(i)     By reason of the foregoing, members of the Damages Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

192.     By reason of the conduct alleged herein, Defendant has violated N.C. Gen. Stat.§ 75-1, *et seq.*

(a)     Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott*

78

*Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

(b)     Defendant entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within North Carolina.

(c)     Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

(d)     Defendant's trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

(e)     Defendant's conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

(f)     Defendant's unlawful conduct substantially affected North Carolina's trade and commerce.

(g)     Defendant's conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(h)     As a direct and proximate cause of Defendant's unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

(i)     By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 75-16.

193.    By reason of the conduct alleged herein, Defendant has violated Or. Rev. Stat. §

79

646.608, *et seq.*

      (a)    Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Oregon.

      (b)    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for Credit Scores, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

      (c)    Defendant's conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendant's actions within the stream of Oregon commerce.

      (d)    Defendant's conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

      (e)    Defendant's conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

      (f)    Defendant's unlawful conduct substantially affected Oregon's trade and commerce.

      (g)    As a direct and proximate cause of Defendant's unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

      (h)    By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

(i)        Pursuant to section 646.638 of the Oregon Unlawful Trade Practices Act, with the filing of this action, a copy of this Complaint is being served upon the Attorney General of Oregon.

194.    By reason of the conduct alleged herein, Defendant has violated S.C. Code Ann. §§ 39-5-10, *et seq.*

(a)        Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within South Carolina.

(b)                    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

(c)        Defendant's conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of Defendant's actions within the stream of South Carolina commerce.

(d)        Defendant's conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

(e)        Defendant's conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

(f)        Defendant's unlawful conduct substantially affected South

81

Carolina trade and commerce.

        (g)      Defendant's unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of South Carolina businesses purchase FICO Scores.

195.    By reason of the conduct alleged herein, Defendant has violated Utah Code Ann. §§ 13-11-1, *et seq.*

        (a)      Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Utah.

        (b)      Defendant is a supplier within the meaning of Utah Code Ann. §§ 13-11-3.

        (c)      Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the business market for credit scores, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

        (d)      Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

        (e)      Defendant's conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of Utah Code Ann. §§ 13-11-3.

        (f)      Defendant knew or had reason to know that its conduct was

unconscionable.

(g)     Defendant's conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

(h)     Defendant's unlawful conduct substantially affected Utah's trade and commerce.

(i)     As a direct and proximate cause of Defendant's unlawful conduct, the members Class have been injured in their business or property and are threatened with further injury.

(j)     By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

196.    By reason of the conduct alleged herein, Defendant has violated Utah Code Ann. §§ 13-5-1, *et seq.*

(a)     Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Utah.

(b)     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

(c)     Defendant's conduct caused or was intended to cause unfair

methods of competition within the State of Utah.

(d)     Defendant's unlawful conduct substantially affected Utah's trade and commerce.

(e)     As a direct and proximate cause of Defendant's unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

(f)     By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including actual damages or $2000 per Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5- 14, *et seq.*

197.    By reason of the conduct alleged herein, Defendant has violated Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

(a)     Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Vermont.

(b)     Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Vermont, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Business Market for credit scores.

(c)     Defendant's conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

84

(d)    Defendant's unlawful conduct substantially affected Vermont's trade and commerce.

(e)    As a direct and proximate cause of Defendant's unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

(f)    By reason of the foregoing, members of Class are entitled to seek all forms of relief available under Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

### FIFTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(On behalf of Plaintiff and**
**the Nationwide Class)**

198.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

199.    As a result of its unlawful conduct described above, Defendant has and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of FICO Scores.

200.    Defendant has benefited from its unlawful acts and it would be inequitable for Defendant to be permitted to retain any of the ill-gotten gains.

201.    Under common law principles of unjust enrichment, Defendant should not be permitted to retain the benefits conferred on them by overpayments by Plaintiff and members of the Damages Class.

### VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and all others similarly situated, respectfully prays that this Honorable Court:

1.    Order that this action may be maintained as a class action pursuant to Rules

23(a) and (b) of the Federal Rules of Civil Procedure, that it be named Representative of the Classes, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action be provided to members of the Class as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure;

2.       Adjudge that Defendant violated the federal antitrust laws as set forth above;

3.       Adjudge that Defendant violated the state antitrust and unfair trade practices laws as set forth above;

4.       Adjudge that Defendant was unjustly enriched as set forth above;

5.       Award Plaintiff and members of the Damages Class actual, double, treble, and exemplary damages as permitted;

6.       Award Plaintiff and members of the Classes pre- and post-judgment interest; Enjoin Defendant from continuing the unlawful actions alleged herein;

7.       Award Plaintiff attorneys' fees and all other costs reasonably incurred in prosecution of this action; and

8.       Award such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a Trial by Jury as to all issues so triable.

August 4, 2020                                 Respectfully submitted,

                                                        /s/ *Charles R. Watkins*

**GUIN, STOKES & EVANS, LLC**
Charles R. Watkins (3122790)
321 South Plymouth Court
Suite 1250
Chicago, IL  60604
Tel:  (312) 878-8391
Fax:  (205) 226-2357
charlesw@gseattorneys.com

**REINHARDT WENDORF & BLANCHFIELD**
Garrett D. Blanchfield (*Pro Hac Vice* forthcoming)
Brant D. Penney(*Pro Hac Vice* forthcoming)
332 Minnesota Street, Suite W-1050
St. Paul, MN  55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

**SPECTOR ROSEMAN & KODROFF, P.C.**
William G. Caldes (*Pro Hac Vice* forthcoming)
Jeffrey L. Corrigan (*Pro Hac Vice* forthcoming)
Jeffery L. Spector (*Pro Hac Vice* forthcoming)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
BCaldes@srkattorneys.com
JCorriganf@srkattorneys.com
JSpector@srkattorneys.com

Brian Murray (*Pro Hac Vice* forthcoming)
Lee Albert (*Pro Hac Vice* forthcoming)
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 530
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

*Attorneys for Plaintiff Garner Properties &
Management and the Proposed Classes*